Hillsborough,
No. 6259.

STATE

*v.*

RUSSELL E. COLLINS, JR., ALIAS EARL RUSSELL.

December 29, 1972.

*Warren B. Rudman,* attorney general, and *Henry F. Spaloss,* assistant attorney general (*Mr. Spaloss* orally), for the State.

*William P. Shea,* by brief and orally, for the State.

GRIMES, J. This case involves the validity of a search warrant and the admission in evidence of inculpatory statements of defendant.

Defendant was found guilty by a jury of assault with intent to kill under RSA 585:22 and possession of a controlled drug with intent to sell under RSA 318-B:26 (I) (a) (2) (supp.). His exceptions were transferred by *Loughlin*, J.

On April 5, 1970, Lt. LeBoeuf obtained a search warrant from a justice of the Manchester District Court to search defendant's room in a rooming house. The affidavit in support of the warrant read as follows:

"At 2:35 p.m. this date, 4-5-70, Lt. LeBoeuf received an anonymous call from a person who stated there is an Earl Russell living at 455 Pine Street, room #5. He is described as 28-5-6-160 — shaggy hair. He carries at all times a .25 Caliber Italian Beretta pistol and also double-barrelled shotgun, sawed off. This caller further stated that on Friday 4-3-70 Russell received a shipment of drugs specifically Amyl Nitrate, Amphetamine tablets and hembutal capsules. He keeps them in a green suitcase in his room along with a large supply of needles and syringes referred to by the caller as sets of works. Caller further stated that Russell's real name is Russell Collins and is wanted for murder in Boston, Massachusetts. Caller refused to give name, but said Russell has been calling to kids down near Caesar's restaurant on Elm Street in Manchester.

"At 2:45 p.m. Contacted Andre Boudreau DOB 3-22-35 of 455 Pine Street, Manager of the rooming house at this address and he verified there was an Earl Russell registered in room #5. He further stated that he had been suspicious about this person because of the number of callers he has been getting. He said that on Wednesday 4-1-70 sometime between 10-11 p.m., two young men came into the rooming house (door is locked and they must ring bell to gain entry). These two young men went to Russell's door and knocked. Russell answered the door and Mr. Boudreau saw one of the two young men give some money to Russell. Russell then went back into the room and a few minutes later came back and handed these fellows two small packets and the two fellows left."

At the foot of the affidavit, the magistrate wrote the following:

"4-5-70 — Personally appeared before me the said Lt. Edmund LeBoeuf and made oath that the foregoing affidavit is true. He also stated that he knows Andre Boudreau and Boudreau is a reliable person. He further stated that Russell carries a gun and is wanted for murder elsewhere."

Lt. LeBoeuf and Lt. Lord, armed with the warrant, went to the rooming house managed by Boudreau who escorted them to the door of defendant's room. When defendant answered the door in response to the knock, Boudreau introduced the police and left. According to the officers, they informed defendant of the warrant and entered. There was a girl in the bed with her back turned to them. Lord left the room to call for assistance, and the girl then began to cry. Defendant asked if he could comfort her and LeBoeuf, after refusing, relented. While leaning over the girl, defendant obtained a gun and turned it on LeBoeuf just as Lord returned to the doorway. Lord was shot and defendant was then overcome by LeBoeuf. Lord was taken to a hospital and defendant to the police station where he was put in a cell.

Lt. French was sent to get a statement from defendant in his cell. He was given the *Miranda* warnings and responded that he did not want to say anything without a lawyer present. Almost immediately, he asked for a doctor and fell to the floor. French went to see if the doctor previously called was coming and then returned to the cell block. Defendant said he was sorry he "fell out" on the officer and after a time of silence, defendant asked for the public defender. French left to advise the desk officer of the request for counsel and then returned to the cell and stood outside. No questions were asked and no conversation took place until, according to French, defendant spoke to him and said: "How's your partner? I hope he's okay. Not for me, but I hope he pulls through. The gun was loose in my hand when it went off. It's only a .25 caliber, not a killer gun. It will just tear you apart, that's all . . . . If they did what they were told, it would have been all right. I would have shot you . . . . If that man killed me, he would have been in his rights . . . ."

Defendant, while admitting the truth of the affidavit, claims it is insufficient to support the issuance of the warrant, relying upon *Aguilar* v. *Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). He also contends that his statement to French is inadmissible under *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). We reject both contentions and affirm the verdicts.

It is true as defendant contends that the information contained in the affidavit originally came from an unknown informer and there is nothing to indicate how she came by the information. However, unlike the situation in *Aguilar,* the informant here furnished a great deal of detail which in itself furnishes some basis to assess the reliability of the information. *See Spinelli* v. *United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *United States* v. *Harris,* 403 U.S. 573, 593, 29 L. Ed. 2d 723, 739, 91 S. Ct. 2075, 2086-87 (1971) (*Harlan,* J., dissenting opinion); *State* v. *Salsman,* 112 N.H. 138, 290 A.2d 618 (1972).

What is even more important, however, is the fact the police obtained a substantial amount of additional information from Boudreau who was not the usual type of police informer but a citizen of known reliability whom the police sought out for information. His information corroborated the information given by the unknown informer. This not only furnished substantial independent information but also furnished a basis for a determination as to the unknown informer's credibility and the reliability of her information. *Spinelli* and *Harris supra; Draper* v. *United States,* 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329 (1959). Taking the affidavit in its entirety and considering it in a common-sense fashion (*United States* v. *Ventresca,* 380 U.S. 102, 13 L. Ed. 2d 684, 86 S. Ct. 1602 (1966), were violated. It is true that Lt. French that it was sufficient to sustain the issuance of the warrant. *See State* v. *Titus,* 106 N.H. 219, 212 A.2d 458 (1965).

With respect to the admission of the defendant's statement, we find no support for the contention that defendant's rights under *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966) were violated. It is true that Lt. French was directed by his superior to obtain a statement from defendant and he went to his cell for that purpose. Defendant

was given the *Miranda* warnings and when he requested a lawyer before saying anything, no questioning took place. When the injured defendant fell to the floor the officer went to check on the doctor. From this time on his presence at the cell was to check on defendant's condition rather than the original purpose of questioning. When asked to get a public defender, the officer left again to check for a lawyer. He returned to check defendant's condition but again asked no questions. It was at this time that defendant made the completely voluntary and unsolicited statement which was clearly admissible under *Miranda. State* v. *Geldart,* 111 N.H. 219, 279 A.2d 588 (1971).

We find nothing in the conduct of Lt. French which would lead us to the conclusion that defendant was induced to speak in violation of his *Miranda* rights. Nor do we find any violation of defendant's fourth amendment rights with respect to the statement. *Silverman* v. *United States,* 365 U.S. 505, 5 L. Ed. 2d 734, 81 S. Ct. 679 (1961), relied on by the defendant, involved a search with a hidden listening device. Here, the police officer's presence was known to the defendant and the statement was addressed directly to the officer. *Wong Sun* v. *United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), involved a statement made during a period of illegal detention, which is not the situation here. *See also Morales* v. *New York,* 396 U.S. 102, 24 L. Ed. 2d 299, 90 S. Ct. 291 (1969).

*Exceptions overruled.*

All concurred.